CANADA STEAMSHIP LINES, Limited, v.
INLAND WATERWAYS COR-
PORATION.

No. 876.

District Court, E. D. Louisiana,
New Orleans Division.

March 12, 1947.

Chaffe, McCall, Bruns, Toler & Phillips and Leon Sarpy, all of New Orleans, La., for plaintiff.

Dart, Guidry & Price and Louis C. Guidry, all of New Orleans, La., for defendant.

BORAH, District Judge.

This is an action for damages alleged to have resulted to plaintiff from the negligence of defendant in causing a shipment of castor oil to be cleared through the Customs by the payment of duty. The essential facts which give rise to this litigation have in the main been stipulated and are in substance as follows:

In June, 1942, there was shipped from Pernambuco, Brazil, via the S. S. Rio Branco, 404 drums of castor oil, for the account of Wm. M. Phelan & Company, Montreal, Canada, consignee and owner, and on July 18, 1942, this shipment arrived at New Orleans with ocean freight prepaid. Knowing that no routing had been specified on this shipment and being desirous of obtaining this movement over their lines, the defendant, Inland Waterways Corporation, contacted Daniel F. Young, Inc., the consignee's agent and quoted them its economical rate to Detroit, Michigan. Young in turn wrote to complainant, Canada Steamship Lines, Ltd., under date of July 15, 1942, advising them of the import rate which the defendant had quoted and suggested that they advise the consignee what their rate would be from Detroit to Montreal, if they were interested in this business. This suggestion was followed, and on the succeeding day complainant, acting through Van Wyck, its freight traffic manager, agreed with the consignee that it would handle the shipment via defendant's barge line to East St. Louis, Illinois, thence by Wabash Railway to Detroit, thence via complainant's steamship line to Montreal at a through rate of $1.09 per 100 lbs. Van Wyck thereupon forwarded all pertinent papers to Rowland, complainant's general agent in New York, who in acknowledgment wrote the following: "I note that you are sending all papers to me to-day—by air mail—special delivery and on receipt of same I will forward them by air mail to the Federal Barge Lines at New Orleans *with full instructions regarding in-transit entry, weighing, etc.*" (Emphasis supplied.)

The papers were later forwarded to defendant by Rowland in a letter dated July 25, 1942, reading as follows:

"Mr. L. I. Bourgeois, General Agent,
Federal Barge Lines,
211 Camp Street,
New Orleans, La.
Dear Sir:
      404 Drums Castor Oil, 196540 lbs,
      Ex S. S. "Rio Branco" at New Orleans.
      For account of Wm. M. Phelan & Co.
      Montreal

At the request of Mr. E. M. Murray, your General Agent in New York, I am enclosing herewith the following documents:

Lloyd Brasileiro B/L1 covering 152 drums Castor Seed Oil, dated Recife June 12th 1942. Certificate of Origin and Inspection from Sociedade Brasileira de Superintendencia, dated Recife, June 9th, 1942. (No. 654).

Declaration of Shipper of Food, Drug & Cosmetic Products, certified at Pernambuca, Brazil, June 11th, 1942 and signed by Companhia Lubeca-S.A.

Consular Certificate dated Pernambuca, Brazil, June 11th, 1942. Original Invoice of Returned American Goods, No. 383, dated Recife, Pernambuca, Brazil, June 10th, 1942.

Lloyd Brasileiro B/L2, covering 252 drums Castor Seed Oil, dated Recife, June 12th, 1942.

Certificate of Inspection from Sociedade Brasileria de Superintendcia No. 653, dated Recife June 8th, 1942.

Original Invoice of Returned American Goods, No. 384, dated Recife, June 10, 1942. Declaration of Shipper of Food, Drug and Cosmetic Products, certified at Pernambuco, Brasil, June 11th, 1942, signed by Companhia Lubeca-S.A.

Consular Certificate, dated at Recife, Pernambuco, Brasil, June 11th, 1942.

The two Bills of Lading enclosed show the ocean freight prepaid.

Will you kindly arrange to have this shipment cleared by a Customs Broker and have the shipment weighed by an official weigher and have same forwarded via the Federal Barge Lines from New Orleans to East St. Louis thence via rail to Detroit, Michigan for furtherance from Detroit to Montreal via the Canada Steamship Lines. The goods are to be consigned to Wm. M. Phelan & Company, 1265 Stanley Street, Montreal.

Will you kindly see that the waybill shows that the goods are to be delivered to the Canada Steamship Lines at the Detroit Harbor Terminals, Detroit, as that is where our vessels transfer freight ex cars.

The freight from New Orleans is to be billed COLLECT through to Montreal on the following basis:

New Orleans to Detroit 74¢ per 100 lbs (as quoted by your N. Y. Office)
Detroit to Montreal 35¢ " " "

Above Rates Subject to 7% Surcharge if Paid in Canadian Funds
However, we will settle your proportion in U. S. Funds. Any charges at New Orleans such as weighing and Customs Brokers Fees etc., is to be advanced against the shipment but settlement will also be made in U. S. Funds.

Will you kindly see that a careful check is made of this shipment and advise us details of same also the forwarding record from New Orleans to East St. Louis and we will check with your St. Louis office regarding the transfer at that point. As this is the forerunner of some attractive business which we expect to be jointly interested in the near future I would appreciate you giving this matter your special attention.

If there is any difficulty in connection with this matter I would suggest that you communicate with the writer or direct with Mr. Phelan at Montreal whose telephone number is Plateau 3565 or Fitzroy 7700.

As this shipment has now been on hand at your Port for some time I trust you can make arrangements for prompt forwarding in order to avoid any storage charges.

Yours very truly,
(Signed) W. Rowland
General Agent."

The instructions which defendant received from complainant are all contained in this one letter and it will be noted that there is no reference to an in-transit entry.

On July 27, 1942, the defendant acknowledged receipt of the letter of July 25th enclosing documents and shipping instructions, and among other things, said: "We will arrange to have shipments cleared through customs, and arrange for weighing, and forward promptly after released, billing all charges as advances against shipment." Accompanying this letter was a copy of a letter of even date that defendant had written to Geo. Wm. Rueff, Inc., Customs Broker, reading as follows:

"We hand you herewith original ocean bills of lading, consular invoices, shippers declarations, and original invoice of returned American goods, covering the following shipments, arriving on board the steamer mentioned above.

B/L 1, 152 drums Castor Oil, marked Balfour–A.C–1802/1953
"  2, 252 drums Castor Oil, marked Balfour–A.B 1550/1801

We will thank you to clear these shipments billing on our Mr. Cook for the duty, if any, and your charges, and having Mr. Kelley advised when shipments are ready for delivery.
Secure return of the ladings from the Collector and hand same to the steamship company, so they will release shipments to us. Thanking you for your prompt attention to this we are,"
Rowland thus had before him certainly no later than July 30th a copy of the exact instructions that defendant had given to the Customs Broker, for on that day he acknowledged the letter without criticizing in the least what the defendant was doing.

When it developed that Geo. Wm. Rueff, Inc., were unable to act in the matter, the defendant wrote an identical letter to Miss M. DuPouey, a customs broker, and she cleared the merchandise pursuant to those instructions. Customs duties in the sum of $5,416.48 were paid on July 31, 1942, the day the shipment left New Orleans but this fact did not become known to the complainant until it received defendant's letter of

August 25, 1942. When so advised, complainant protested immediately to defendant that this shipment should have been forwarded in bond to Canada without the payment of duty at New Orleans.

Under protest and in order to obtain release of the goods, complainant paid the Wabash Railway the sum of $5,416.48 which amount Wabash had previously paid to defendant, and complainant immediately made demand on defendant for reimbursement. Failing to receive satisfaction and defendant having failed in its efforts to secure a refund of the said sum from the United States Customs Department, this suit followed. In this action complainant is seeking to recover the sum aforementioned together with interest and costs on the ground that defendant negligently caused this shipment to be entered under a consumption entry whereas this shipment under the customs of the trade should have been cleared through the customs on an in-transit entry.

The stipulated facts and those which appear of record uncontroverted have been summarized and there remains for consideration the testimony of the three witnesses who testified orally at the trial.

Rowland, complainant's general freight agent, testified that when he wrote his letter of July 25 he did not know that under the Customs regulations the shipment could not be weighed unless it was actually cleared and the duty paid. Nor did he know what the requirement of the Customs was in New Orleans with respect to the shipper and that was his reason for forwarding to Bourgeois all the documents which accompanied his letter of July 25. When questioned about defendant's letter of instructions to the customs broker, a copy of which was in his possession on the day prior to the date when the duty was paid, he said that he never assumed that there would be any duty on goods consigned to Canada; that he was under the impression that the defendant had sent a copy of his letter of July 25 to the broker showing that the goods were to be consigned to the owner in Montreal, and apart from that he thought that the defendant, handling many shipments for Canada, would

conclude that these shipments were covered by in-transit or T. & E. entry.

Austin, a witness for the complainant, was questioned in regard to the letters of July 25 and 27, and he made it plain that his answers were based on his twenty-five years experience as a Customhouse broker and were simply indicative of what he would have done as a customs broker had he received these letters. And at no time did he venture an opinion as to the custom among barge line officials or employees with reference to customhouse matters. It will serve no useful purpose to analyze his testimony in full. It is sufficient in view of the future discussion to now say that Austin apparently was of the opinion that the letter of July 25 indicated that an in-transit shipment was intended but he willingly conceded that the letter was complicated and he said that he would have referred the matter back to the writer to ascertain what he meant. He explained this to some extent by saying that the word "clear" as it is used in this letter was ambiguous to him as a customs broker and that the request for weighing at New Orleans was almost impossible of accomplishment since there is no provision of the Customs law allowing an in-transit shipment to be weighed at the port of arrival. On cross examination he admitted that accompanying this letter of July 25 were several documents that were needed to make a consumption entry and which were not needed to make an in-transit entry and that "when receiving these documents and the letter stating that the merchandise was to be cleared, you (he) could have gotten the impression that they wanted a consumption entry."

Carey, a witness for the defendant, testified that he worked under Bourgeois and handled the shipment in question; that in his capacity of import and export clerk he handled all import shipments and forwarded them out to destination and had been doing the same kind of work for about fifteen years. As to the propriety of this action he expresses not the slightest doubt. He maintains that he was instructed to clear the shipment which according to his understanding and that of everyone else in the

business means to pay the duty if duty was due. And this fact coupled with the fact that they sent all the necessary documents which were not needed for an in-transit entry convinced him beyond doubt that a consumption entry was proper. He said that the instructions he received to weigh the shipment did not have any bearing on his interpretation of the instructions to clear the shipment; that he knows that shipments moving inbound go through some formality to allow weighers to weigh them, if permit could be obtained, but where the shipper has paid the duty, he can have anyone at all do the weighing for him. Nor did he attach great importance to the fact that the goods were destined for Montreal. He received his instructions from complainant to clear the shipment which means to pay the duty and for all he knew the consignee may have desired to divert this shipment, which it could not do if the shipment was moving in-transit under bond.

■■ From the foregoing it is apparent that the relationship between the parties is that of principal and agent, and the question here is whether the defendant as agent was negligent in carrying out the written instructions which it received from its principal, the complainant, on July 25, 1942. In determining this question defendant's conduct is not to be measured by those standards applicable to an experienced customs broker, but the inquiry is, whether other persons exercising the same calling or employment, and being experienced and skilled therein, would or would not have interpreted complainant's letter of instructions as defendant did.

■ In the letter of July 25 defendant was specifically instructed "to have this shipment cleared by a Customs Broker and have the shipment weighed by an official weigher." By dictionary definition the verb "clear" is defined as follows: "To conform to the customs and other port regulations by payment of duties, fees, etc." "To fees from legal detention, as imported goods on a ship, by paying duties and dues, * * *." "To free from customs charges or legal detention; take out of bond; as to clear a ship or goods." See Webster's New International Dictionary, Second Edition, Century Dictionary 1889 Edition, and Funk and Wagnalls New Standard Dictionary 1928, respectively. Now what does the evidence in this case show? Austin says the word has two meanings in the customs. "One is to make preparation to move it and the other is to release it from the custody of the government, but they must be explicit, Sir." That where you say clear merchandise from the customhouse, it generally means to pay the duty. Carey says, "The word 'clear', as I understand it and the way every one else in that business understands it, is to make a consumption entry." He was asked if he had ever heard of any other construction given to the word and he answered, "Well, clear in-transit or inbound, but they make it clear, 'clear inbound'. That would make it clear and you cannot go wrong that way." He stated that "It has always been my practice and custom that where an importer or shipper sends us documents on a shipment on steamer, if they send us bills-of-lading, ocean bills-of-lading, consular invoices and such documents, it was their intention at that time for a consumption entry to be made, and in most every case that we received papers, if it was an in-transit shipment, we would only get a copy of the ocean bill-of-lading, or if they did send other documents they would make it very plain that the shipment moved on an in-transit entry, because in making an in-transit entry it would be necessary to make a copy of the ocean bill-of-lading, so in receiving all the documents that accompanied these papers, I assumed they wanted a consumption entry made and I proceeded to do it and advised the parties from whom I received the papers to that effect." Austin willingly conceded that had he in his capacity of customhouse broker received these documents and the letter stating that the merchandise was to be cleared he could have gotten the impression that they wanted a consumption entry. And in commenting on defendant's letter of July 27 to Miss DuPoucey, the broker, he said: "That letter was proper for a person not fully conversant with Customs, because in the last paragraph of the first page of the letter" the direction is to have the shipment cleared by customs and weighed.

Considering the specific language of the letter of July 25 to "clear" the merchandise, the fact that the documents accompanying this letter were required for a consumption entry but were not needed to make an in-transit entry, the fact that the merchandise could only be weighed under a consumption entry and the oral testimony as herein set forth, this court is of the opinion that defendant's employee, Carey, acted in the best of faith and that he was justified in concluding that a consumption entry was intended and in instructing the broker to "clear" the merchandise.

█ The defendant's letter of July 27 and an exact copy of its instructions to the broker were in complainant's hands during business hours on the day before the duty was paid. If complainant was not satisfied with the interpretation which defendant was giving to its letter of July 25, it should have immediately made that fact known, or if complainant did not know precisely what the defendant was doing it was most certainly its duty to inquire. But complainant did nothing other than acknowledge receipt of the letter and its inaction is not to be excused on the ground that Rowland's appreciation of the then existing situation was influenced by certain unwarranted assumptions on his part.

█ While it is believed that the evidence in this case is consistent with the view that complainant's letter of instructions was not ambiguous to a skilled transportation official such as Carey and that only to an experienced customs broker such as Austin would there arise a doubt as to its meaning, it is not necessary to so decide. Construing the testimony in the light most favorable to complainant, I am convinced that the best that can be said of this letter is that it was ambiguous and susceptible of two interpretations, namely, the one adopted and followed by defendant and the one which complainant contends was intended. In this situation there is no need of determining which of the two interpretations should have controlled the other for it is a settled rule of the law of mandate that an agent in the presence of instructions which are ambiguous or capable of different constructions is not liable for disobedience or its consequences in case he makes an honest mistake and adopts one construction when the principal intended another. The applicable rule of law is stated in Volume 3 Corpus Juris Secundum, Agency, § 148, as follows:

"If the instructions of a principal to his agent are ambiguous or capable of different constructions, the agent is not chargeable with disobedience or its consequences in case he makes an honest mistake and adopts a construction different from that intended by the principal; the loss if any, in such cases, must fall upon the principal rather than upon the agent. However, the agent is not, under such circumstances, at liberty to disregard the instructions entirely and to substitute therefor his own judgment, but must follow one of the interpretations reasonably derivable from the terms of the instructions."

The stipulated facts which are incorporated herein by reference, are adopted by the court as its findings of fact. In addition, the court finds that complainant's letter of July 25, 1942, was ambiguous and susceptible of two interpretations, namely, the one adopted and followed by defendant and the one which complainant contends was intended. And the court concludes as a matter of law that the defendant acted reasonably and in good faith in following the instructions and is not liable for disobedience or its consequences.

The Clerk is accordingly instructed to enter judgment for defendant with costs.